## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| RONALD GODEC, | ) | CASE NO.     1:12-cv-01041 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| | ) | MAGISTRATE JUDGE GREG WHITE |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security | ) | **REPORT & RECOMMENDATION** |
| | ) | |
| Defendant. | ) | |

Plaintiff Ronald Godec ("Godec") challenges the final decision of the Commissioner of Social Security, Michael J. Astrue ("Commissioner"), denying his claim for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Title II and Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* This matter is before the Court pursuant to 42 U.S.C. § 405(g) and Local Rule 72.2(b).

For the reasons set forth below, it is recommended that the final decision of the Commissioner be AFFIRMED.

### I.  Procedural History

On June 17, 2008, Godec filed an application for POD and DIB.  On March 16, 2009, Godec filed an application for SSI.  Both applications allege a disability onset date of February 23, 2008.  His applications were denied both initially and upon reconsideration.

On August 24, 2010, an Administrative Law Judge ("ALJ") held a hearing during which Godec, represented by counsel, and an impartial vocational expert ("VE") testified.  On September 8, 2010, the ALJ found Godec was able to perform a significant number of jobs in the national economy and, therefore, was not disabled.  The ALJ's decision became final when the Appeals Council denied further review.

## II.  Evidence

### Personal and Vocational Evidence

Age fifty-three (53) at the time of his administrative hearing, Godec is a "person closely approaching advanced age" under social security regulations.  *See* 20 C.F.R. § 404.1563(d) & 416.963(d).  (Tr. 23.)  Godec has a high school diploma and past relevant work as a communications technician.  *Id.*

### Medical Evidence[1]

Godec received treatment at the East Cleveland Health Center between April 2008 and April 2009 primarily for complaints of knee and shoulder pain.  (Tr. 241-57, 498-519, Exhs. 1F &15F.)  On April 25, 2008, M. Khan, M.D., diagnosed hypertension, knee arthritis, and right shoulder bursitis/tendinitis.  (Tr. 243.)  He also prescribed medications.  *Id.*  During a subsequent appointment in May of 2008, Godec reported that "Naproxen [was] helping a lot" but mild pain remained in his knees and shoulders.  (Tr. 244-45.)  In June of 2008, he stated that the "pain in knees [was] under control."  *Id.*  An x-ray from the same period revealed "minimal degenerative changes at the patellofemoral joints," preserved joint spaces, and no loose bodies, fractures, or joint effusions.  (Tr. 253.)  On July 29, 2008, Godec requested a referral for an MRI of his knees and a "letter for lawyer."  (Tr. 249.)

On October 27, 2008, Godec presented at the Lake West Hospital Emergency Room ("ER") complaining of sharp pain in his lower back.  (Tr. 488.)

---

[1]  Godec challenges the RFC determination by arguing only that he cannot perform the physical requirements of light work.  As such, the recitation of the medical evidence is not intended to be all-encompassing, and focuses only on physical conditions, namely lower back and knee pain mentioned in the parties' briefs and the ALJ's opinion.

Godec underwent physical therapy and pain management at the Cleveland Clinic between January of 2009 and September of 2009.  (Tr. 265-339, 520-600, Exhs. 5F, 16F.)  Godec began treatment with Anne Rex-Torzok, D.O., on January 6, 2009 for his complaints of bilateral knee and lower back pain.  (Tr. 583-89.)  On examination, Godec's knees revealed some mild retropatellar crepitus with flexion/extension.  (Tr. 587.)  Otherwise, Godec had a full range of motion with no pain or restrictions.  *Id*.  The back examination revealed some mild asymmetry but no pain upon lumbar range of motion; a negative straight leg-raising test bilaterally; 5/5 strength in the lower extremities; and, a normal gait.  *Id*.  Godec could walk on his heels and toes without difficulty.  *Id*.  Dr. Rex-Torzok recommended physical therapy.  *Id*.  An MRI performed the same date revealed "intervertebral disk space narrowing at L4/5 and L5/S1 compatible with degenerative disk disease.  Anterior and lateral hypertrophic changes [were] seen involving lower lumbar vertebrae.  There [were] degenerative changes involving the posterior element in the lower lumbar spine.  No acute fracture."  (Tr. 587, 593.)  X-rays of Godec's knees revealed "[s]light lateral tilting of the patellas.  The knees are otherwise unremarkable."  (Tr. 329.)

During an April 2009 appointment, Plaintiff had full knee and lower back range of motion with no tenderness; a negative straight leg-raising test; intact sensation and motor strength; and, a stable gait.  (Tr. 513.)

On February 17, 2009, Godec returned to Dr. Rex-Torzok reporting only limited benefit from four physical therapy visits, stating that he was "very concerned about ligamentous damage and tears with respect to his previous job walking up and down ladders and lifting bricks."  (Tr. 559.)  Godec also brought disability paperwork for Dr. Rex-Torzok to fill out, however, she indicated that she did not feel there was a relationship between the pain he was experiencing and his previous job.  *Id*.  Examination revealed a non-antalgic gait, no limp, some knee crepitus, full range of motion, intact 5/5 motor strength, and the ability to walk on his heels and toes without difficulty.  *Id*.  She felt that pain management was necessary.  *Id*.  A right-knee MRI performed on February 18, 2009 "was negative for any kind of meniscal pathology or ligamentous damage."  (Tr. 554.)  Godec did, however, have arthritic changes on the medial femoral condyle as well as through the patellofemoral compartment.  *Id*.

3

On March, 5, 2009, Godec returned to Dr. Rex-Torzok.  (Tr. 553-57.)  Lumbar examination revealed no significant tenderness, but there was some hamstring and hip flexor tightness and mild patellar discomfort.  (Tr. 553-54.)  Godec had 5/5 strength in his legs, a negative straight leg-raising test, full knee range of motion, and no significant pain with patellar grind.  *Id.*  Dr. Rex-Torzok noted that Godec "seemed disappointed that the MRI really did not show any further damage to the knee ...."  (Tr. 554.)  She reassured Godec that the "only pathology identified was some mild degenerative changes."  *Id.*  Dr. Rex-Torzok offered Godec corticosteroid injections for his knee pain, but Godec declined indicating that he preferred to obtain a second opinion.  *Id.*

Dr. Rex-Torzok referred Godec to rheumatologist Ajay Buddaraju, M.D., for an opinion regarding Godec's knee pain.  (Tr. 539-43.)  On March 31, 2009, Dr. Buddaraju's physical examination was largely normal.  (Tr. 541.)  He concluded that Godec did not have inflammatory arthritis.  (Tr. 543.)  He recommended pain medication, steroid injections, strengthening exercises, and weight loss, as well as follow up treatment at the pain clinic.  *Id.*

On April 1, 2009, Godec was seen by Andrew Kostraba, M.D., complaining of sinus pressure and cold symptoms.  (Tr. 535.)  Dr. Kostraba diagnosed an upper respiratory virus infection and recommended fluids and rest.  *Id.*  Two months later, on June 11, 2009, Dr. Kostraba prepared a Physical Residual Functional Capacity Assessment.[2]  (Tr. 259-60.)  Therein, Dr. Kostraba indicated that Godec had the ability to lift 50 pounds occasionally and 20 pounds frequently; stand/walk less than two hours at a time during an eight-hour workday; and, sit less than two hours at a time during an eight-hour workday.  (Tr. 259.)  According to Dr. Kostraba, Godec needed to alternate his position after sitting for 45 minutes and after standing for 15 minutes, thus requiring a sit/stand at will option.  *Id.*  He was uncertain whether Godec needed to lie down at unpredictable intervals.  *Id.*  Dr. Kostraba did not provide any medical findings that would support the above restrictions.  (Tr. 260.)  He further indicated that Godec's

---

[2] There is no indication that Godec was seen by Dr. Kostraba on that date and Godec does not cite any prior treatment with Dr. Kostraba aside from the one visit on April 1, 2009 to treat cold-like symptoms.

4

impairments would cause him to miss work more than three days per month.  *Id*.  He explained that Godec was being seen by a physical therapist and a pain management specialist, and that "this assessment should change over the next month after therapy [–] will need to be reassessed." (Tr. 260.)  Dr. Kostraba also noted that a reassessment was needed in mid-July by Godec's "PT [physical therapist] and pain."  *Id*.

On July 2, 2009, Godec told James Nagy, Physical Therapist, that he experienced pain in the upper back and neck due to sitting for extended periods.  (Tr. 308.)  He also complained of lower back pain with standing, which he rated as eight of ten.  *Id*.  He rated his pain with sitting as five of ten, but he was pain free sitting at the time of the appointment.  *Id*.  Mr. Nagy noted that pain-free sitting was a sign of improvement, though he indicated that Godec was not totally compliant with the Home Exercise Program ("HEP").  *Id*.

On July 7, 2009, Godec returned to Dr. Rex-Torzok complaining of ongoing lower back and knee pain, particularly in his left knee.  (Tr. 302.)  An MRI performed on July 8, 2009 on Godec's left knee indicated degenerative chondral changes and a lateral meniscal tear.  (Tr. 307.)

On July 13, 2009, Pasha Saeed, M.D., wrote that Godec was "incapable of work at this time due to diagnosis of low back pain and left knee meniscal tear.  This expected duration is indefinite and to be determined at a later date."  (Tr. 262.)

On July 16, 2009, Godec told Mr. Nagy that he had some pain in his right lower extremity with walking that began over the weekend, but that he currently had no back pain when sitting.  (Tr. 293-94.)  Mr. Nagy noted that Godec's tolerance of the treatment that day was excellent, and that there was no increase in pain with the day's exercises.  (Tr. 294.)

On July 27, 2009, Daniel Single, M.D., an orthopedic surgeon, examined Godec and diagnosed arthritis of the left knee with potential symptomatic lateral meniscal tear.  (Tr. 284-85.)  Godec told Dr. Single that the previous round of injections from Dr. Saeed helped his back pain, but not his knee pain.  (Tr. 284.)  Dr. Single recommended and administered a lidocaine and cortisone left knee injection, after which Godec noted some improvement in his knee pain. (Tr. 285.)  Dr. Single noted that the decision on surgical intervention will depend upon Godec's response to cortisone, and that surgery, if done, would keep him out of work for four to six

weeks.  *Id*.  The next day, Godec told Mr. Nagy that his pain while standing was seven of ten and that he can only stand five minutes before the onset of back pain.  (Tr. 281.)  Mr. Nagy's assessment was that Godec's symptoms were "confined to prolonged standing; he functions well in standing for short periods and appears to have no sitting pain."  (Tr. 282.)

On August 10, 2009, Dr. Single noted that Godec complained of issues paying child support, and that Godec asked him whether he would be willing to attribute the knee impairments to prior work in order to obtain workers' compensation benefits.  (Tr. 275.)  Dr. Single's knee examination was essentially normal.  (Tr. 276.)  Dr. Single expressed concern that there were "secondary gain issues involved."  *Id*.  He recommended that Godec follow up with a back specialist and observed that diagnostic knee arthroscopy might be warranted.  *Id*.

In October and November of 2009, Godec received epidural steroid injections.  (Tr. 368, 375, 378.)

On November 2, 2009, Godec met with Dr. Kostraba to address his hypertension and hyperlipidemia.  (Tr. 371.)  Dr. Kostraba noted that he last saw Godec six months earlier.  *Id*. Dr. Kostraba's physical examination revealed no lower extremity edema.  (Tr. 372.)

On December 30, 2009, Godec presented to Euclid hospital complaining of a headache and facial swelling.  (Tr. 430.)  Computed Tomography ("CT") scans of Godec's sinuses and neck were unremarkable.  (Tr. 445, 447.)  The following day, Godec was seen by Dr. Kostraba to address the same complaints.  (Tr. 657.)  Dr. Kostraba's impression was pain syndrome of an uncertain cause.  *Id*.  He noted that "[s]ome of the patient's motivation may be related to some [child/family] support issues."  *Id*.  Dr. Kostraba ordered MRIs of the cervical and lumbar spines. *Id*.

On January 7, 2010, Dr. Kostraba wrote a letter to Godec advising him that an "MRI of the cervical (neck) spine shows considerable disc problems and degenerative changes.  The discs are bulging at multiple levels and are pressing upon the nerves and nerve sac."  (Tr. 450.)  He strongly advised Godec to follow up with spine specialists.  (Tr. 450.)

After referral by Dr. Kostraba, Godec was seen by Augusto T. Hsia, M.D. on January 13, 2010.  (Tr. 650-54.)  Dr. Hsia reviewed the MRI of Godec's cervical spine and performed a

physical examination which revealed decreased lumbar range of motion and cervical and lumbar tenderness. *Id*. Godec's gait was normal and antalgic, and both toe and heel walking were decreased. (Tr. 653.) However, two out of five Waddell's signs were "inappropriate."[3] (Tr. 654.) Dr. Hsia noted that Godec presented with a long-standing history of multiple physical complaints, but that the MRIs showed no definite nerve impingement or significant cord abnormalities. *Id*. He also found no clinical radiculopathy, and an essentially unremarkable neurological examination. *Id*. He referred Godec to Dr. Saeed for cervical trigger point injections. *Id*. Spine surgery was not recommended at that time. *Id*.

On February 19, 2010, Philip Danko, PT, noted as follows:

> The patient has not improved over the last month in terms of his c/o headache and neck pain, although he did display some improvement with cervical ROM. He continues to struggle to explain his symptoms and how they are affected, either positively or negatively, with physical testing as well as with each given exercise. He continues to require verbal cuing with each exercise as well as with any adjustment to his seated and standing posture as he truly seems disinterested in complying to any suggestion to improve these areas. It is difficult to determine if any of the patient's symptoms are musculoskeletal in nature due to inconsistent pain response and good over all ROM and strength with tests.

(Tr. 623.)

On February 23, 2010, Godec was seen by Dr. Kostraba, who opined that Godec's "main focus is receiving a letter or some excuse out of a job search class, which he has been court ordered to do. He notes he will go to jail if he does not have a medical excuse." (Tr. 615.) Godec did not appear to be in pain, and Dr. Kostraba indicated he was "having trouble finding an organic cause of this patient's issues. Malingering or some secondary gain must be considered." (Tr. 616.)

On March 3, 2010, Dr. Kostraba referred Godec for a physical capacity evaluation at

---

[3] "A positive Waddell's sign indicates that there exists a non-organic (*i.e.*, psychological or psychosocial) component to an individual's lower back pain." *Huckleberry v. Comm'r of Soc. Sec.*, 2012 U.S. Dist. LEXIS 126716 at note 1 (E.D. Mich. Aug. 6, 2012) (citations omitted); *Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 420 (6th Cir. 2008) (Waddell's signs are a clinical test for patients with low back pain that can be used to indicate whether the patient is exaggerating symptoms); *Mabra v. Comm'r of Soc. Sec.*, 2012 U.S. Dist. LEXIS 118187 at note 3 (S.D. Ohio Aug. 21, 2012) ("'Waddell's signs' refers to a system of identifying psychogenic or nonorganic manifestations of pain.") (citations omitted).

South Pointe Outpatient Rehab.  (Tr. 709-10.)  Christine Ontko, OTR/L, noted Godec had a higher level of anxiety as evidenced by "multiple questions and need for reassurance that he can get disability."  *Id*.  Ms. Ontko twice noted submaximal effort during testing.  (Tr. 709.)  Ms. Ontko found that Godec had the capacity to perform work in the light category.  She found that Godec could occasionally lift 39 pounds, frequently lift 20 pounds, and constantly lift 7 pounds; stand for 20 minutes; and would do better in a situation allowing a sit/stand at will option.  (Tr. 709.)

On April 29, 2010, Godec was seen by Dr. Hsia, who noted that he was "not sure why [Godec] is back here but he brought in a paper with a list of complaints."  (Tr. 602.)  Godec told Dr. Hsia that he recently served jail time for failure to pay child support, and claimed that he was facing an additional 28-day sentence if he could not find a job.  *Id*.  Dr. Hsia noted Waddell's signs were 2/5 and inappropriate.  (Tr. 605.)

After referral by Dr. Hsia, Matthew Bunyard, M.D., F.A.C.R., examined Godec on May 25, 2010.  (Tr. 666.)  Dr. Bunyard had a low suspicion of any systemic rheumatic disease and doubted the presence of rheumatoid arthritis, connective tissue disease, or microcrystalline disease.  (Tr. 672.)  While Dr. Bunyard observed that Godec "may have some mild degenerative changes in the axial and appendicular skeleton, [those changes] would not explain his pains [as] well."  *Id*.

Approximately ten months after the ALJ's decision, on June 21, 2011, Godec's counsel submitted additional records to the Appeals Council in support of his application.  (Tr. 718.)  In a letter dated February 3, 2011, Robert Juhasz, D.O., indicated he had been treating Godec since August 13, 2010 for multiple complaints, including memory loss, depression, fatty liver disease, chronic low back pain, obstructive sleep apnea, hyperlipidemia, and anxiety.  (Tr. 719.)  Dr. Juhasz quoted the results of a neuropsychiatric evaluation performed by Cynthia Kubu, Ph.D., on March 26, 2010.  *Id*.  Dr. Juhasz also noted that Godec had problems with chronic low back pain that "limited his ability to perform any work related tasks with any repetition for any duration of time."  (Tr. 719-20.)  Dr. Juhasz's concluded that Godec "is not able to be gainfully employed." (Tr. 720.)

8

On March 1, 2011, Dr. Juhasz also completed a physical RFC form in which he indicated that, in an eight-hour workday, Godec could lift/carry less than ten pounds occasionally or frequently; could stand/walk less than two hours; could sit less than two hours; must alternate position every 15 minutes; required the opportunity to shift positions at will; and needed to lie down at unpredictable intervals due to fatigue.  (Tr. 724-25.)  Dr. Juhasz also felt that Godec could reach, handle, finger, and push/pull less than occasionally; could never feel; and he would miss work more than three times per month due to his impairments.

***Hearing Testimony***[4]

At the hearing, the ALJ posed the following hypothetical to the VE:

> Assume a person with the claimant's age, education and work experience, who is limited to no more than medium work as defined in the Dictionary of Occupational Titles.  Can occasionally climb ramps or stairs, never climb ladders, ropes, or scaffolds, can occasionally stoop, kneel, crawl and crouch.  And work that is limited to simple, routine and repetitive tasks.

(Tr. 64-65.)

The VE testified that such an individual could not perform Godec's past relevant work, but could perform several jobs such as cleaner, kitchen helper, and packager.  (Tr. 65.)

The ALJ posed a second hypothetical that assumed a person who could perform light work; no climbing ladders, ropes, or scaffolds; occasional climbing of ramps and stairs; occasional stooping, kneeling, crawling and crouching; and, limited to simple, routine and repetitive tasks.  (Tr. 66.)  In response to the second hypothetical, the VE testified that such an individual could perform the job of an office helper, laundry worker, and ticket seller.  (Tr. 66.)

The ALJ posed a third hypothetical that assumed a person who could perform light work with an at-will sit/stand option; no climbing ladders, ropes, or scaffolds; occasional climbing of ramps and stairs; occasional stooping, kneeling, crawling and crouching; and, limited to simple, routine and repetitive tasks.  (Tr. 67.)  In response to the third hypothetical, the VE testified that such an individual could perform the jobs of an office helper, ticket seller, and mail clerk.  (Tr.

---

[4] As Godec does not challenge the ALJ's credibility determination, the Court will omit Godec's hearing testimony.

9

67.)

### III.  Standard for Disability

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).[5]

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended.  42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

Godec was insured on his alleged disability onset date, February 23, 2008 and remained insured through the date of the ALJ's decision.  (Tr. 14.)  Therefore, in order to be entitled to POD and DIB, Godec must establish a continuous twelve month period of disability commencing between February 23, 2008 and September 8, 2010.  Any discontinuity in the twelve month period precludes an entitlement to benefits.  *See Mullis v. Bowen,* 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F. 2d 191, 195 (6th Cir. 1967).

A claimant may also be entitled to receive SSI benefits when he establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and

---

[5]  The entire process entails a five-step analysis as follows: First, the claimant must not be engaged in "substantial gainful activity."  Second, the claimant must suffer from a "severe impairment."  A "severe impairment" is one which "significantly limits ... physical or mental ability to do basic work activities."  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets a required listing under 20 C.F.R. § 404, Subpt. P, App. 1, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000).  Fourth, if the claimant's impairment does not prevent the performance of past relevant work, the claimant is not disabled. For the fifth and final step, even though the claimant's impairment does prevent performance of past relevant work, if other work exists in the national economy that can be performed, the claimant is not disabled.  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

## IV.  Summary of Commissioner's Decision

The ALJ found Godec established medically determinable, severe impairments, due to "[a]djustment disorder with anxiety and depression; severe obstructive sleep apnea; lower cervical degenerative changes with significant foraminal narrowing; lumbar spondylosis at L4-5 and L5-S1 and lower lumbar degenerative interspace changes; degenerative chondral changes and lateral meniscus tear in left knee; full thickness loss of articular cartilage in the patella and medial femoral condyle with additional partial thickness loss in both areas and small joint effusion in the right knee; obesity; and cervicogenic and tension headaches."  (Tr. 14.) However, his impairments, either singularly or in combination, did not meet or equal one listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1.  (Tr. 15.)  Godec was found incapable of performing his past relevant work, but was determined to have a Residual Functional Capacity ("RFC") for a limited range of light work.  (Tr. 16, 23.)  The ALJ then used the Medical Vocational Guidelines ("the grid") as a framework and VE testimony to determine that Godec was not disabled.  (Tr. 23-24.)

## V.  Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance."  *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also Richardson v. Perales*, 402 U.S. 389 (1971).

The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d

11

762, 772-3 (6th Cir. 2001) (*citing Mullen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached. *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir.1996); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  Analysis

Godec argues that the RFC determination is not supported by substantial evidence as it

contradicts the well-supported and unchallenged opinions of three separate treating sources.[6]
(ECF No. 15 at 7-11.)  Furthermore, Godec avers that the ALJ failed to set forth good reasons for
rejecting said opinions.  *Id* at 10.  Finally, Godec also asserts that the ALJ's opinion is
inconsistent with a functional capacity evaluation performed in March of 2010.  *Id.*

  Under Social Security regulations, the opinion of a treating physician is entitled to
controlling weight if such opinion (1) "is well-supported by medically acceptable clinical and
laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence
in [the] case record."  *Meece v. Barnhart*, 192 F. App'x 456, 560 (6th Cir. 2006) (*quoting* 20
C.F.R. § 404.1527(d)(2)).  "[A] finding that a treating source medical opinion . . . is inconsistent
with the other substantial evidence in the case record means only that the opinion is not entitled
to 'controlling weight,' not that the opinion should be rejected."  *Blakley v. Comm'r of Soc. Sec.*,
581 F.3d 399 (6th Cir. 2009) (*quoting* Soc. Sec. Rul. 96-2p, 1996 SSR LEXIS 9 at *9); *Meece*,
192 Fed. App'x at 460-61 (Even if not entitled to controlling weight, the opinion of a treating
physician is generally entitled to more weight than other medical opinions.)  Furthermore,
"[t]reating source medical opinions are still entitled to deference and must be weighed using all
of the factors provided in 20 C.F.R. § 404.1527 and 416.927."  *Blakley*, 581 F.3d at 408.[7]
Nonetheless, the opinion of a treating physician must be based on sufficient medical data, and
upon detailed clinical and diagnostic test evidence.  *See Harris v. Heckler*, 756 F.2d 431, 435 (6th
Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406 ("It
is an error to give an opinion controlling weight simply because it is the opinion of a treating
source if it is not well-supported by medically acceptable clinical and laboratory diagnostic

---

  [6]  Specifically, Godec identifies the opinions Drs. Juhasz, Kostraba, and Saeed.

  [7]  Pursuant to 20 C.F.R. § 416.927(c), when not assigning controlling weight to a treating
physician's opinion, the Commissioner should consider the length of the relationship and
frequency of examination, the nature and extent of the treatment relationship, how well-
supported the opinion is by medical signs and laboratory findings, its consistency with the record
as a whole, the treating source's specialization, the source's familiarity with the Social Security
program and understanding of its evidentiary requirements, and the extent to which the source is
familiar with other information in the case record relevant to the decision.

techniques or if it is inconsistent with other substantial evidence in the case record.") (*quoting* SSR 96-2p).

Godec asserts that the ALJ failed to set forth good reasons for rejecting the June 2009 opinion of Dr. Kostraba.  The ALJ claimed to ascribe only "little weight" to the opinion to the extent it conflicted with the RFC.  (Tr. 20.)  First, Godec misstates Dr. Kostraba's opinion.  (Tr. 15 at 4.)  Dr. Kostraba did not state that Godec could stand, walk, or sit for no more than two hours in an eight hour workday.  *Id*.  Rather, Dr. Kostraba indicated that Godec could not stand/walk or sit for two hours "at a time" during an eight-hour workday.  (Tr. 259.)  It is unclear the exact amount of time Dr. Kostraba thought Godec could stand/walk or sit total.  *Id*.

Dr. Kostraba did opine that Godec's impairments would cause him to miss work more than three days per month, a limitation that typically precludes gainful employment.  *Id*. However, Dr. Kostraba's opinion also explained that Godec was being seen by a physical therapist and a pain management specialist, and that Godec's assessment should change or be reassessed within the next month.  (Tr. 260.)  As such, Dr. Kostraba's opinion cannot be reasonably construed as an opinion of permanent functional limitation or as an assessment of Godec's abilities over a twelve month span.

The ALJ specifically noted the limited scope in time of Dr. Kostraba's opinion.  (Tr. 20.) He also noted that Dr. Kostraba did not see Godec for six months and did not treat his knee or back pain.  *Id*.  Finally, the ALJ cites Dr. Kostraba's subsequent treatment and suspicion of malingering as undermining the June 2009 opinion.  Specifically, the ALJ cites notes from a February 2010 visit wherein Dr. Kostraba stated that Godec did not appear to be in pain, that he was having trouble finding an organic cause of Godec's pain, and that "malingering or some secondary gain" was considered.  (Tr. 20, 616.)  The reasons offered by the ALJ for the weight ascribed Dr. Kostraba's opinion are legally sufficient.

However, assuming for the sake of argument that the reasons offered were inadequate, it is questionable whether Dr. Kostraba was a "treating physician" at the time the June 2009 opinion was rendered.  Although not argued by the parties, under Social Security regulations, a "treating source" is defined as follows:

> Treating source means your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you.  Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s).  We may consider an acceptable medical source who has treated or evaluated you only a few times or only after long intervals (*e.g.*, twice a year) to be your treating source if the nature and frequency of the treatment or evaluation is typical for your condition(s).  We will not consider an acceptable medical source to be your treating source if your relationship with the source is not based on your medical need for treatment or evaluation, but solely on your need to obtain a report in support of your claim for disability.  In such a case, we will consider the acceptable medical source to be a nontreating source.

20 C.F.R. § 416.902.

In a similar case, the Sixth Circuit, in *Daniels v. Comm'r of Soc. Sec.*, 152 Fed. App'x 485 (6th Cir. 2005), found that a physician who only saw the claimant twice was not a treating physician despite the ALJ referring to the physician as a treating source.  The *Daniels* court found as follows:

> Daniels next argues that Dr. Pinson's opinion was not afforded deference by the ALJ. ***  The ALJ's opinion referred, in passing, to Dr. Pinson as a treating source or treating physician, thus adopting Daniels's own characterization of Dr. Pinson. ***  We conclude that the treating source regulations and *Wilson* are not implicated by the facts of this case.  The ALJ's failure to specifically address Dr. Pinson's opinion, despite casually referring to her as the treating source, is not surprising given that Dr. Pinson does not meet the criteria under the regulations to be defined as a treating physician.  The regulations define a treating physician as a physician who has provided medical treatment or evaluation and "who has, or has had, an ongoing treatment relationship with" the claimant.  20 C.F.R. § 404.1502. The Commissioner will consider a claimant to have an ongoing treatment relationship when "the medical evidence establishes that [the claimant] see[s], or has seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the claimant's] medical condition(s)." *Id*.  A physician who has treated a patient only a few times may be considered a treating source if that frequency of visits is appropriate for the claimant's medical condition. *Id*.  In this case, Dr. Pinson saw Daniels on two occasions, November 13, 2001, and November 16, 2001.  Daniels, however, sought treatment for his back pain on many more occasions than these two visits, including six visits to the emergency room and several other visits to King's Daughters' Outreach Center. Daniels's two visits to Dr. Pinson within the span of a few days is not a frequency consistent with the treatment of back pain, as evidenced by the fact that he received treatment from other sources on many other occasions.

*Daniels*, 152 Fed. App'x at 489-91 (footnotes omitted); *accord Hakkarainen v. Astrue*, 2012 U.S. Dist. LEXIS 16431 (N.D. Ohio Jan. 19, 2012); *see also Taylor v. Astrue*, 245 Fed. Appx.

387, 391 (5th Cir. 2007) (two visits to doctor did not establish a treating relationship).

It does not appear that Godec was seen by Dr. Kostraba on the date the opinion was submitted, and Godec does not point to any prior treatment with Dr. Kostraba aside from a single visit in April of 2009.  One visit does not establish a treating relationship.  Furthermore, Godec's subsequent visits to Dr. Kostraba after June 2009 are irrelevant in determining whether the relevant opinion was that of a treating physician at the time it was completed.  "The question is whether [the claimant] had the ongoing relationship with [the physician] to qualify as a treating physician at the time he rendered his opinion."  *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 506 (6th Cir. 2006) (emphasis added).  In *Kornecky*, the Sixth Circuit declined to find a treating physician relationship, noting that subsequent visits to a physician after the RFC assessment had been made "could not retroactively render [the doctor] a treating physician at the time of the assessment." 167 Fed. App'x at 506 n.10; *accord Thompson v. Astrue*, 2011 U.S. Dist. LEXIS 84542 (N.D. Ohio, Aug. 2, 2011).  The *Kornecky* court also explained that the regulation requiring an ALJ to provide good reasons for the weight given a treating physician's opinion does not apply to an ALJ's failure to explain his favoring of several examining physicians' opinions over others.  *Id*.

Godec also argues that the ALJ did not give good reasons for rejecting the opinion of Dr. Saeed.  The ALJ ascribed little weight to Dr. Saeed's July 2009 letter that Godec was incapable of work due to low back pain and left knee meniscal tear because the opinion was on an issue reserved to the Commissioner.[8]  (Tr. 20, 262.)  It is correct that an ALJ is not bound by conclusory statements of a treating physician maintaining a claimant is disabled.  *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984).  "Opinions on some issues, such as [opinions that you are disabled or your residual functional capacity], are not medical opinions, as described in paragraph (a)(2) of this section, but are, instead, opinions on

---

[8]  Dr. Saeed stated that "[the] duration is indefinite and to be determined at a later date." (Tr. 262.)  As such, even if credited fully, Dr. Saeed's opinion does not necessarily support a disability meeting the twelve-month threshold.

16

issues reserved to the Commissioner because they are administrative findings that are dispositive of a case ..." 20 C.F.R. § 404.1527(e). Furthermore, the ALJ explained that Dr. Saeed's opinion was inconsistent with Godec's own statement on July 27, 2009 that the injections helped his back pain. (Tr. 20.) The ALJ also noted the relatively brief history of treatment by Dr. Saeed. *Id*. Although the ALJ treatment of Dr. Saeed's opinion is rather perfunctory, Dr. Saeed's July 2009 letter is itself terse and fails to offer any basis or support for his opinion aside from mentioning his diagnoses. A diagnosis alone, however, does not indicate the functional limitations caused by the impairments. *See Young v. Sec'y of Health and Human Servs.*, 925 F.2d 146,151 (6th Cir. 1990) (diagnosis of impairment does not indicate severity of impairment); *Bradley v. Sec'y of Health and Human Servs.*, 862 F.2d 1224,1227 (6th Cir. 1988) (signs of arthritis not enough; must show that condition is disabling). As such, the ALJ did not err by rejecting an unsupported opinion on the ultimate issue of disability.

With respect to Dr. Juhasz, Godec completely overlooks the fact that Dr. Juhasz's opinion was not part of the record when the ALJ rendered his decision. The ALJ cannot reasonably be expected to consider sources that he has not seen. In the Sixth Circuit, it is well established that Godec as the plaintiff – and not the ALJ – has the burden to produce evidence in support of a disability claim. *See, e.g., Wilson v. Comm'r of Soc. Sec.*, 280 Fed. Appx. 456, 459 (6th Cir. May 29, 2008) (*citing* 20 C.F.R. § 404.15129(a)). *See also Struthers v. Comm'r of Soc. Sec.*, 101 F.3d 104 (table), 1999 WL 357818 at *2 (6th Cir. May 26, 1999) ("[I]t is the duty of the claimant, rather than the administrative law judge, to develop the record to the extent of providing evidence of mental impairment."); *Landsaw v. Sec'y. of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986) ("The burden of providing a complete record, defined as evidence complete and detailed enough to enable the Secretary to make a disability determination, rests with the claimant. 20 C.F.R. §§ 416.912, 416.913(d)."); *cf. Wright-Hines v. Comm'r of Soc. Sec.*, 597 F.3d 392, 396 (6th Cir. 2010) (although an "ALJ has an inquisitorial duty to seek clarification on material facts," a plaintiff, who is represented by counsel, must provide a "factual record" relating to the length of his employment when his past work was part of the record and was the basis of the initial decision to deny benefits). However, there is a special,

17

heightened duty requiring the ALJ to develop the record when the plaintiff is "(1) without counsel, (2) incapable of presenting an effective case, and (3) unfamiliar with hearing procedures." *Wilson*, 280 Fed. Appx. at 459 (*citing Lashley v. Sec'y of Health & Human Servs.*, 708 F.2d 1048, 1051-52 (6th Cir. 1983)). The special duty requirement is not at issue in this case since Godec was represented by an attorney. Thus, "the ultimate burden of proving disability" remained squarely on Godec. *See Wilson*, 280 Fed. Appx. at 459 (*citing Trandafir v. Comm'r of Soc. Sec.*, 58 Fed. Appx. 113, 115 (6th Cir. Jan. 31, 2003)); *see also Guy v. Astrue*, 2010 WL 1141526 at **10-11 (M.D. Tenn. Mar. 4, 2010).

Furthermore, this Court cannot conduct a *de novo* review or invalidate the ALJ's decision based on new evidence that was not part of the record. Sentence six of 42 U.S.C. § 405(g) allows a court to remand for consideration of new evidence that was not previously before the agency, "but only upon a showing that there is new evidence which is material and that there is ***good cause for failure to incorporate such evidence into the record in a prior proceeding***." *Bass v. McMahon*, 499 F.3d 506, 513 (6th Cir. 2007) (emphasis added). In addition, evidence is only "material" for purposes of a sentence six remand if it is time-relevant, *i.e.*, either relates to the period on or before the date the ALJ rendered his decision. *See, e.g., Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 478 (6th Cir. 2003). Godec has not sought a sentence six remand, has not set forth good cause for failing to include Dr. Juhasz's opinions, and has not established that the evidence is material.

Finally, Godec asserts that the ALJ's RFC is inconsistent with a functional capacity evaluation performed in March of 2010 by Ms. Ontko, an occupational therapist. (ECF No. 15 at 10.) Godec, however, misconstrues the significance of the evaluation. Ms. Ontko twice noted submaximal effort during testing. (Tr. 709.) She found that Godec had the capacity to perform work in the light category, explaining that he could stand for 20 minutes, but would do better in a situation allowing a sit/stand at will option. *Id.* "The regulations define light work as lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted in a particular light job may be very little, a job is in this category when it requires a good deal of walking or standing -- the primary difference between

18

sedentary and most light jobs....  Since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday.  Sitting may occur intermittently during the remaining time."  Social Security Ruling ("SSR") 83-10.  Godec points to nothing in Ms. Ontko's opinion suggesting that she believed he could not perform the standing requirements of light work other than the limitation that he not stand for more than twenty minutes *at a time*.   Godec's argument that he could only stand for eighty minutes in an eight-hour workday is unfounded.  (ECF No. 15 at 11.)  Although Ms. Ontko stated that Godec could sit for ninety minutes at a time and stand for twenty minutes at a time, nowhere does Ms. Ontko suggest that Godec was required to sit any specific length of time – let alone ninety minutes – before being able to stand again.  As the ALJ specifically incorporated a sit/stand at-will option in the RFC for light work, the Court sees no apparent inconsistency between the functional capacity evaluation and the RFC.

Assuming *arguendo* that the ALJ's opinion was not consistent with Ms. Ontko's opinion, an occupational therapist is not considered a "treating source" whose opinion is entitled to deference, and the requirement that the Commissioner give "good reasons" for the weight given to an opinion is, therefore, inapplicable.  *See, e.g., Alworden ex rel. K.L.A. v. Comm'r of Soc. Sec.*, 2011 WL 1118611 (W.D. Mich. Jan. 24, 2011) *report and recommendation adopted sub nom. Alworden v. Comm'r of Soc. Sec.*, 2011 WL 1102848 (W.D. Mich. Mar. 25, 2011); *Burke ex rel. A.R.B. v. Astrue*, 2008 WL 1771923 at *7 (E.D.Ky. April 17, 2008) ("the deferential reason-giving requirements for the rejection of a treating-source opinion necessarily do not apply where the source in question is not an 'acceptable medical source' ").  Because Ms. Ontko was not an acceptable medical source, the ALJ was not bound to accord it any special weight or state his reasons for failing to do so.  Accordingly, Godec's claims of error are without merit.

19

## VII.  Decision

For the foregoing reasons, the Court finds the decision of the Commissioner supported by substantial evidence.  Accordingly, the decision of the Commissioner should be AFFIRMED and judgment entered in favor of the defendant.

s/ Greg White_____
United States Magistrate Judge

Date: January 30, 2013

### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**